GEORGE F. LYNCH, JR. *v.* HENRY M.
BUCHANAN, C.P.A. ET AL.

[No. 1341, September Term, 1976.]

*Decided September 16, 1977.*

The cause was argued before GILBERT, C. J., and MENCHINE and MELVIN, JJ.

*Joseph T. Lilly* and *John B. Cullen* for appellant.

*Michael L. Glaser*, with whom were *Glaser, Fletcher & Johnson, P.C.* on the brief, for appellees.

MENCHINE, J., delivered the opinion of the Court.

In 1971 and prior years, Henry M. Buchanan, trading as Henry M. Buchanan Company, had conducted his business as a licensed certified public account (CPA) in his individual capacity. George F. Lynch, then not licensed as a CPA, was employed as an accountant by Buchanan.

In December 1971, Henry M. Buchanan undertook the organization of a professional corporation for profit pursuant to the provisions of the Maryland Professional Service Corporation Act (Corporations and Associations Article, §§ 5-101 through 5-122). The corporate entity, known as "Henry M. Buchanan, CPA, P.A." began operations on January 2, 1972, with Henry M. Buchanan as its sole stockholder with 300 shares. George F. Lynch was designated as Director of the corporation in the Articles of Incorporation.

On March 7, 1972, George F. Lynch, who by then had been licensed as a CPA, became a stockholder of the professional service corporation with one hundred shares.[1] Both Buchanan and Lynch became employees of the corporation.

The new corporation passed the first year of its existence in seeming harmony, with Buchanan its president; Lynch its

* Note: *Certiorari* denied. Court of Appeals of Maryland, November 22, 1977.

1. § 5-112 of the Maryland Professional Service Corporation Act prohibits issuance of capital stock to anyone other than one licensed to perform the service for which the corporation is organized.

vice president and secretary. In September 1973, this semblance of harmony "melted into air, into thin air."

Buchanan put it that, "September 20, 1973, George Lynch called me up on the phone at 10 o'clock and said basically, 'I quit.' And then at 10:01 said, 'I am now working for the Financial Committee for Mr. Nixon.' " [2]

Lynch put it that, "I had a disagreement with Mr. Buchanan." He explained that, "When I left the corporation my thought was to completely disassociate myself from the corporation. So I wanted to get rid of my shares of stock."

Lynch's departure from the corporation was followed on the same day by the departure of employee Joseph Quinn, who, with Lynch and Buchanan, had comprised the three CPA's employed by the corporation.

The effect of these withdrawals was thus described by Buchanan:

> "I was faced with a tremendous workload. We had a 60-day period during which to prepare the report for Judge Waddy. [3] It took most of my people. My work was extremely backed up and I was faced with the tax season coming up during which time my office prepared over 200 tax returns. Two men walked out on me.
>
> * * *
>
> Q How many hours per day did you work prior to the time Mr. Lynch and Mr. Quinn left your firm?
>
> A I would say before they left I was putting in about 50 hours a week. Then after they left in the range of 60 to 70 hours a week."

---

2. Lynch ackowledged that upon leaving the corporation as an employee he "was doing some work for the Finance Committee to Re-elect the President .... They became a client of mine." Buchanan had described the Committee as "the largest client of the corporation."

3. A reference to a judicially ordered report in connection with the operations of the Finance Committee for whom the corporation had performed services.

On December 10, 1973, Lynch addressed a letter to Buchanan, reading in appropriate part as follows:

> "Hank, as I am no longer actively associated with Henry M. Buchanan, CPA, PA, I am not interested in reaping benefits from the continued success of the organization. I am, however, interested in 'cashing in' for my efforts. In order to properly evaluate the worth of the stock, I want to review a current financial statement and I am asking for an accrual financial statement based on what you have told me in the past, namely that, the officers owe to the stockholders an accounting.
>
> "If you or the corporation is interested in purchasing my stock, I will, of course, give you first option. To be fair I will mention that I have already received an offer for my stock from a Certified Public Accountant.
>
> "I hope we can work this out quickly and amicably."

His hope proving vain and his complaints unresolved, Lynch, on September 6, 1974, filed a "Petition for Involuntary Dissolution" against Henry M. Buchanan, CPA, P.A., in the Circuit Court for Montgomery County, in Equity. Henry M. Buchanan and Micheline E. Buchanan [4] were joined as parties defendant.

After answers and a multiple day trial, the chancellor dismissed the petition. Lynch has appealed.

Corporations and Associations Article, § 3-413 (b) (2) provides as follows: "Any stockholder entitled to vote in the election of directors of a corporation may petition a court of equity to dissolve the corporation on grounds that: . . . (2) The acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent."

In discussing the meaning and effect of this statutory provision in *Turner v. Flynn & Emrich Co.*, 269 Md. 407, 410,

---

4. Micheline E. Buchanan, the wife of Henry M. Buchanan, was an Incorporator and Director of the corporation.

306 A. 2d 218, 219 (1973), Judge Singley for the Court of Appeals said:

> "It is a generally recognized principle that absent extraordinary circumstances, without an enabling statute a court of chancery has no jurisdiction to decree the dissolution of a corporation on application of a shareholder, *Wall & Beaver Street Corp. v. Munson Line*, 58 F. Supp. 101, 107 (D. Md. 1943) (applying Maryland law); *Murray-Baumgartner Surgical Instrument Co. v. Requardt*, 180 Md. 245, 252, 23 A. 2d 697 (1942), and that when a statutory remedy is available, the complainant must bring himself within the express terms of the act, *Hill v. Vaill*, 23 Conn. Sup. 72, 176 A. 2d 881, 883 (1961); *Coucounas v. Coucounas*, 33 Misc. 2d 559, 225 N.Y.S.2d 410 (1962); *Gordon v. Graham*, 137 W. Va. 553, 73 S.E.2d 132, 135 (1952); 16A Fletcher, *Cyclopedia of the Law of Private Corporations* § 8083 at 214-15 (1962 Rev. Vol.)."

We think this statutory provision was not intended to extend in any material way the long standing rule of law reiterated in *Williams v. Ice Co.*, 176 Md. 13, 26, 3 A. 2d 507, 513 (1939), wherein it was said:

> "In a word, if the question involved is one concerning the internal management of corporate affairs, void of acts *ultra vires*, fraudulent, or illegal, courts of equity will refrain from granting relief to a minority stockholder, or, as stated in *McDoughall v. Gardiner*, L.R. 1 Ch. Div. 21 (cited with approval in *Shaw v. Davis*, *supra*, and *Davis v. Wright*, *supra*): 'Nothing connected with the normal internal disputes between the shareholders is to be made the subject of a bill by some one shareholder in behalf of himself and others, unless there be something illegal, oppressive or fraudulent — unless there is something *ultra vires* on the part of the company, *qua* company, or on the part of the

majority of the company, so that they are not fit persons to determine it; . . ."

Appellant, in paragraphs 10 and 11 of his petition, made numerous allegations of suggested illegal, oppressive and fraudulent conduct. The chancellor found no evidence supportive of the bulk of those allegations. Our examination of the record persuades us that this conclusion of the chancellor was correct and that it is necessary for us here to discuss only the issues raised by paragraphs 10a, 11a, 11b, and 11h of the petition that read as follows:

"(10) That since that time, Defendant Henry M. Buchanan, as managing officer and director of the Corporation, has acted in an illegal manner in the following particulars:

(a) Defendant Henry M. Buchanan allegedly held stockholders meeting on January 4, 1974, without written notification to other stockholders.

(11) That Defendant Henry M. Buchanan, as managing officer and director of the Corporation, has acted in a fraudulent manner in the following particulars:

(a) Defendant Henry M. Buchanan arbitrarily raised his salary by authorizing and paying himself a bonus in excess of $20,000.00 as of January 31, 1974, which, on information and belief, was for the purpose of lowering Petitioner's equity in the Corporation to compel Petitioner to sell his stock at an inadequate price.

(b) Defendant Henry M. Buchanan allowed, and is continuing to allow, the loaning of corporate funds to himself and his wife, Micheline E. Buchanan, to pay their personal obligations.

(h) On information and belief, Defendant Henry M. Buchanan invested in the profit sharing plan corporate funds over and above the amount allowed for those then eligible to participate therein with the intent to

> deprive Petitioner of, and mislead Petitioner to, the value of his stock. Said actions were also done to benefit Defendant Henry M. Buchanan by increasing his share of the profit sharing plan."

The trial judge filed a written opinion in the cause. We conclude that the chancellor's findings of fact were based upon substantial evidence and his decision is in accord with law. Accordingly, we adopt the following portion of that opinion:

> "Finally, the Court must consider the allegations in the petitioner's Paragraphs (10) sub-paragraph (a) and (11) sub-paragraph (a) (b) and (h) as Maryland has taken a different view where directors, officers or shareholders have been guilty of self-dealing. In *Indurated Concrete Corporation v. Abbott*, 195 Md. 496, the Maryland Court of Appeals held that where directors or shareholders act in such a way to use their positions to advance their own individual interests as distinguished from that of the corporation or acquire interest[s] that may conflict with the clear and proper discharge of their duties that transaction is not ipso facto void but conversely it is not necessary to establish that there has been actual fraud practiced by the party holding the confidential or fiduciary relationship. The proof is upon that director or shareholder once it is shown that he has dealt in a way to perfect his own interest to show the fairness and adequacy of the transaction. In other words, the burden of going forward shifts.
>
> "Later discussing self-dealing in *Chesapeake Construction Corp. v. Rodman*, 256 Md. 531, the Court of Appeals said that transactions between a corporation and its officers or directors are always closely scrutinized and if shown to be unfair or in bad faith will be nullified. The burden of proving that the transaction is fair and equitable falls upon

the corporation or director. In summarizing these allegations the Court holds the evidence shows that Henry M. Buchanan acting as a director and majority stockholder and without any notice to the minority stockholder George F. Lynch, Jr., entered into three transactions by which he may have profited and by the nature of which places the burden on him to show that these transactions were fair and equitable. With regard to the allegation contained in Paragraph (11) (b) that Henry M. Buchanan loaned money from the corporation to himself and his wife. It has been shown that these loans, though made, were fully repaid with seven percent interest and the Court, as the trier of the facts, finds that not only was there no unfairness in the original transactions but they have been repaid and there is no injury to the minority stockholder. With regard to allegations in Paragraph (11) (h) to the effect that approximately Seventeen Thousand Dollars ($17,000.00) was contributed into a profit sharing and pension plan during the year 1973, after George F. Lynch had left the employ of the company and without any notice to Mr. Lynch as a director of the corporation, the Court finds that the transactions were also fair. The contributions were well within the limits allowed by the Internal Revenue Service and were made into a plan to benefit not only the defendant, Henry M. Buchanan, but the other employees of the company and, as testified to by Mr. Buchanan, they were for the purpose of maintaining employee morale. Mr. T. Robert Verkonteren, a C.P.A. called as an expert witness by the defendant testified that the contributions were not excessive and were paid from profits of the company. The Court as the trier of fact holds that there was nothing unfair in these transactions. The third complaint set forth in Paragraph (11) (a) is that in January, 1974, Henry M. Buchanan, defendant, who was at that time

drawing a salary of approximately Forty Thousand dollars ($40,000.00) per annum from the corporation declared himself a bonus of some additional Twenty Thousand Dollars ($20,000.00) in advance of actually performing services for the corporation without notice to the minority stockholder (Paragraph (10) (a)). The defendant attempts to justify and show the fairness of this transaction by a computation of anticipated overtime in the future and by showing that the salary expenses of the corporation were not any greater, in fact were less than they had been when the other two accountants, including the plaintiff, were employed. There was also evidence presented that, in fact, Mr. Buchanan was at that time working more hours than were normally required and that he computed his overtime in advance. Declaring this bonus far in advance of performing the services by a director of the corporation for his own benefit was undoubtedly, under the Maryland law, an abuse of discretion and could be subject to Court action. However, the undisputed evidence shows that Mr. Buchanan did not draw this bonus until close to the end of that fiscal year and that the bonus when declared was a book entry only. The Court finds that the defendant had then performed services entitling him to the bonus and under the evidence the bonus was not unfair so as to require the Court to intervene and dissolve a well functioning corporation."

We point out additionally with respect to the allowance for overtime that Lynch himself acknowledged that from its inception it had been corporation policy to pay time and a half for overtime to all its officers and employees. There was evidence to the effect that Buchanan was required to devote up to 1000 additional hours of overtime labor per year after Lynch withdrew from the corporation.

With respect to the corporation's contributions to the

profit sharing and pension fund, we note that historically, the concept of the professional service corporation was to provide a device whereby practitioners of a licensed profession and their employees might obtain the tax benefits already available to officers and employees of business corporations under Federal Tax Law.[5]

As the chancellor pointed out, the corporate contributions were well within permitted limits. Lynch, as a CPA, certainly knew that a principal purpose of the corporation was to achieve those tax benefits. Any suggestion to the contrary would tax credulity. Lynch's action "disassociating" himself from the corporation alone prevented him from sharing in them. In such circumstances, continuing reasonable contributions by the corporation to the profit sharing and pension fund in no way constitutes "illegal, oppressive or fraudulent" acts in violation of § 3-413 (b) (2), *supra*. That which was in fact done by the corporation was that which was intended to be accomplished by its formation.

In sum, we find nothing justifying dissolution of the corporation. Neither do we find any circumstances justifying imposition of lessor constraints upon the individual appellees under appellant's claim for other relief.

Appellees moved to dismiss the appeal upon the ground that appellant failed to comply with Maryland Rule 1028 b. Appellees included the omitted portions of the record as an appendix to their brief. It does not appear that appellees were prejudiced. We shall deny the motion to dismiss. *East. Wash. Ry. v. Brooke*, 244 Md. 287, 223 A. 2d 599 (1966).

> *Motion to dismiss appeal denied, decree affirmed.*
>
> *Appellant to pay the costs.*

---

5. In Cavitch, *Business Organizations*, Vol. 4A, Chap. 81, p. 321 (Rev. ed. 1977), it is said:

> "Professional association or professional corporation statutes have been passed in many states simply and solely to enable the self-employed professional person to share in some of the many tax benefits long afforded to employees of non-professional enterprises, particularly in the tax bonanza of qualified pension and profit-sharing plans."