WILLIAM H. SANDERS, *et al.*

*v.*

ROSELAWN MEMORIAL GARDENS, *et al.*

(No. 12662)

Submitted January 23, 1968.    Decided February 27, 1968.

92

*Hudgins, Coulling & Brewster, L. R. Coulling, Jr.,* for appellants.

*Sanders, Sanders & Bivens, Joseph M. Sanders, Jr., Joseph M. Sanders,* for appellees.

CALHOUN, JUDGE:

This case is before the Court on appeal from a final judgment of the Circuit Court of Mercer County entered in a civil action instituted in that court in August, 1965, by William H. Sanders and Katherine L. Sanders, husband and wife, as plaintiffs, against Roselawn Memorial Gardens, Inc., a corporation, A. T. Gott, Eula M. Bay, Elmer Hall Bay, E. B. Gott and Myrtle Gott, as defendants. The individual defendants named above, who may be referred to hereafter in this opinion as the Gotts, are the grantors in a deed by which they conveyed to the plaintiffs a tract of thirty acres of land approximately one mile from the City of Princeton, in Mercer County, upon which land the plaintiffs subsequently constructed their home. Roselawn Memorial Gardens, Inc., which sometimes hereafter in this opinion will be referred to as Roselawn, has constructed and now maintains and operates a cemetery nearby.

The basic purpose of the civil action is to enforce in favor of the plaintiffs the provisions of a written compromise agreement entered into by them with Roselawn. The written compromise agreement was entered into for the purpose of adjusting and settling certain differences which had arisen between the parties by reason of the construction, maintenance and proposed expansion of the cemetery near the plaintiffs' home. After the action was instituted, the trial court entered an order, pursuant to agreement of all parties, by which George A. Morton and Elizabeth Morton, husband and wife, and sole owners of the stock of Roselawn were made additional parties defendant to the action.

The case was tried before the court in lieu of a jury upon testimony taken at the bar of the court. In connection with the trial, the judge, accompanied by counsel, took a view of the premises. By an order entered pursuant to a written opinion of the trial court which was made a part of the record, judgment was rendered in favor of the defendants. By an order subsequently entered, the trial court overruled a motion to set aside the judgment and affirmed the judgment previously entered.

The exact date of the latter order is subject to some confusion or uncertainty. By its initial language it purports to set forth a judgment rendered by the court on June 4, 1966. It was endorsed for entry by the trial judge on June 10, 1966. The certificate of the clerk of the trial court indicates that it was entered on the court order records on June 11, 1966. The petition for appeal to this Court states that the appeal is sought from a judgment entered on June 10, 1966. The petition for appeal was filed in the office of the clerk of this Court on February 7, 1967. It appears, therefore, that the filing of the petition for appeal was timely. Nevertheless, the circumstances of this case illustrate the difficulty which this Court too often encounters in determining upon what date a certain action was taken or a judgment entered in the trial court. Fortunately, the confusion and uncertainty are not of a serious or prejudicial character in this case but we believe that it may not be amiss for us here to admonish the bench and bar and clerks

of trial courts of record that care should be exercised in properly and accurately recording court proceedings.

The deed conveying the 30-acre tract of land to the plaintiffs is dated December 7, 1953. The plaintiffs soon thereafter erected on the 30-acre tract a dwelling at a cost of approximately one hundred thousand dollars. Photographs of this house were made exhibits and a part of the record. It was erected in a rural, farming area, no other homes being nearby. There was no cemetery in the area at that time. A residential development known as City View Heights has been developed and made a part of the City of Princeton. The residential area thus developed is approximately one-fourth mile from the plaintiffs' property.

About the time the construction of the plaintiffs' home was nearing completion, Roselawn purchased a parcel of land which is referred to in the record as a part of the Hunter land. Roselawn was originally incorporated in West Virginia by three men who were residents of Tennessee, one of whom was George A. Morton, a civil engineer. At the time of the trial, Morton and his wife had become the sole owners of the stock in the corporation and were residing at Princeton.

The Hunter tract purchased by Roselawn contains approximately twenty acres and is referred to in the record as the eastern portion of the Roselawn cemetery. By a deed dated June 15, 1957, Roselawn obtained a conveyance of a tract of 59.4 acres lying west of its 20-acre tract. The 59.4-acre tract, which is referred to in the record as the western portion of the cemetery, was conveyed to Roselawn by substantially the same grantors as the grantors in the deed by which the 30-acre tract had been conveyed to the plaintiffs. Both portions of the cemetery, generally speaking, lie south of the plaintiffs' property.

A portion of Roselawn's 20-acre tract adjoins the Sanders' 30-acre tract. Between the Sanders' 30-acre tract and the 59.4-acre Roselawn tract, there lies a body of land owned by Earl Gott and others, which is colored brown on a large map of the entire area which was filed as an exhibit and

made a part of the record in the case. At the time of the trial, George A. Morton testified that he had an option to purchase the area shown in brown on the map, either in the name of the Roselawn corporation or in his own name as an individual, or in behalf of his wife and himself as individuals, and, in either event, to incorporate it in and make it a part of the entire cemetery by the system of cemetery roads and eventually to use that area, or a portion of it, for burial purposes.

The area designated as the brown area on the map is owned by the Gotts and lies immediately south of and adjacent to the plaintiffs' 30-acre tract. It also adjoins the northeastern portion of Roselawn's tract of 59.4 acres. It will be pointed out more fully hereafter in this opinion that one of the questions involved in the case is whether the contemplated purchase of this land and its contemplated incorporation as a part of the Roselawn cemetery would be in violation of the provisions of the written compromise agreement made by and between the plaintiffs and Roselawn.

By the 1953 deed which conveyed to the plaintiffs the tract of 30 acres, there was also conveyed to them "a thirty foot right of way * * *, over the present roadway * * *, with the provision that the said thirty foot right of way shall be laned by the erection of a fence on the western side of the said roadway, at the joint and equal expense of the said parties of the first part and the parties of the second part." Pursuant to the provision of the deed quoted above, the parties to the deed jointly erected a woven wire fence supported by locust posts on the western edge of the 30-foot strip of land. On the opposite or eastern boundary of the 30-foot strip, there was in existence a fence previously erected which marked the western boundary of the Hunter property from which Roselawn subsequently received the conveyance of twenty acres which constitute the eastern portion of the cemetery.

The purpose of the conveyance of this 30-foot right of way was to afford the plaintiffs a road or means of travel to and from "the old Princeton-Bluefield Road." Other

property owners of the area previously had and thereafter continued to have a right to use the same "right of way", road or easement as a means of travel to and from their several properties. The road was unpaved and the traveled portion thereof was only about ten feet in width. While the plaintiffs improved the road somewhat after they purchased the 30-acre tract, it is obvious that it continued to be rather unsatisfactory for purpose of vehicular travel, particularly in the wintertime. The plaintiffs planted red pine trees on the inside or eastern side of the fence which they helped to erect on the western edge of the 30-foot right of way.

Roselawn acquired the 20-acre portion of the Hunter land for cemetery purposes in November, 1955. The first burial in this area was on May 12, 1956. When the plaintiffs learned of Roselawn's plans to operate a cemetery on the 20-acre tract, they became concerned because the cemetery was to be located in front of and near their home and adjacent to their 30-foot right of way. Consequently they employed the late George Richardson, Jr., a prominent attorney and a member of a firm of attorneys having offices in the City of Bluefield in Mercer County. On November 23, 1955, Mr. Richardson directed a letter to Roselawn's attorney, who was engaged in the practice of law in the City of Princeton. The body of this letter was as follows: "Mr. and Mrs. William Sanders and some other owners of property in the immediate vicinity of the two tracts of land recently acquired by Roselawn Memorial Gardens, Inc., are concerned about the effect upon their property of the cemetery project which appears to be shaping up. They have asked me to help them in looking after their interests and it occurred to me that perhaps you and Mr. Brammer would like to sit down with us and tell us what you have in mind. Let me know, if you please, when we can see you and where?" The man referred to in the letter as Mr. Brammer was a real estate agent who had been engaged to purchase real estate in the area for Roselawn.

George A. Morton testified that negotiations with the plaintiffs which ultimately resulted in the written compro-

mise agreement had continued over "a period of at least six months." He testified that in that connection he met with William H. Sanders and his attorneys and that he "had talks with Mr. Richardson a number of times." In the meantime, as has been stated previously, Roselawn had acquired the tract of 59.4 acres by the deed dated June 15, 1957. This deed also granted to Roselawn "an Easement across a thirty feet wide roadway, as now used, to be used in common with others for road right-of-way purposes * * * between two fences, one on either side of said 30 feet wide roadway, the Hunter tract being on the east side of said roadway and the Gott tract being on the west side of said roadway, * * *." The language quoted immediately above refers, of course, to the 30-foot right of way or easement granted to the plaintiffs in connection with the conveyance to them of the tract of 30 acres. By the same deed for 59.4 acres, there was also conveyed to Roselawn "an easement for road right of way purposes to be used in common with others, over, along, across and through a forty (40) feet wide roadway as now used, * * *." The 40-foot easement thus granted extends along the northern portion of the Gott property which is colored brown on the exhibit map and immediately adjacent to the southwest boundary of the plaintiffs' 30-acre tract.

The written agreement was duly executed by the parties, the respective signatures were acknowledged before a notary public and the writing thus executed was admitted to record on the deed book records in the Office of the Clerk of the County Court of Mercer County. The agreement, subject to omissions of certain portions which are not regarded as material to a proper decision of the case, is as follows:

"THIS AGREEMENT, made and entered into on this 10 day of October, 1958, by and between ROSELAWN MEMORIAL GARDENS, INC., a corporation, party of the first part, hereinafter called 'Roselawn', and WILLIAM H. SANDERS and KATHERINE L. SANDERS, husband and wife, parties of the second part, hereinafter called 'Landowners';

"WITNESSETH:

"WHEREAS, certain differences have arisen between the parties hereto out of the construction and operation of a cemetery by Roselawn adjacent to the property of Landowners just west of the corporate limits of the City of Princeton, in Mercer County, West Virginia; and

"WHEREAS, the parties hereto wish to resolve amicably all differences between them without resort to legal action;

"NOW, THEREFORE, Roselawn and Landowners contract and agree with each other as follows:

"*FIRST*:    Roselawn agrees to beautify and not to bury bodies in a certain tract of its cemetery which is situate on the west side of the twin roads (shown in black on the hereinafter described map) leading into said cemetery from the northern edge of U. S. Routes 19 and 460, said tract of land being designated in red on a map entitled 'Roselawn Memorial Gardens, Mercer County, W. Va. Prepared by George A. Morton, Reg. Eng'r., Scale 1'' = 100', which map is attached hereto and made a part of this agreement.

"*SECOND*:  Roselawn hereby releases and relinquishes all of its right, title and interest in and to that 40 feet wide easement leading across the Gotts' property situate south of Landowners' property, and being all of that easement designated in dark green on said map. Roselawn hereby agrees not to reacquire said easement.

"*THIRD*:    Roselawn covenants and agrees not to purchase that certain tract of land owned by the said Gotts situate south and in front of Landowners' property, and being all of that tract of land designated in brown on the attached map.

"*FOURTH*:    Roselawn covenants and agrees to forthwith plant on its property a hemlock hedge along the eastern edge of the road (shown in blue on the attached map) leading into Landowners' property. The stumps of said hemlock hedge will be situate 8 feet east of the existing fence line. Roselawn covenants and agrees that it will not bury bodies within 8 feet of the eastern edge of said road. In the event that Landowners secure a more

suitable roadway to their property, it is hereby understood and agreed between the parties to this agreement that Roselawn may remove said hemlock hedge and may use all or any part of said 8 feet for burial purposes.

\*   \*·   \*   \*

"*SEVENTH*: In consideration of the foregoing undertakings by Roselawn, Landowners hereby release, acquit, and forever discharge Roselawn from any and all actions, claims, damages, demands, costs and losses which they or either of them now have against Roselawn by reason of the construction and operation of said cemetery within its present boundaries and within the boundaries of the land proposed to be purchased from said Hunter."

The plaintiffs and other members of their family left their home on August 24, 1965, and, upon their return on the evening of the following day, they found that Roselawn had commenced a project of altering and widening the road over the 30-foot right of way. The plaintiffs immediately called their attorney. Next morning when William H. Sanders left home to go to work, he discovered that Roselawn was continuing work on the right of way by use of a bulldozer and other earth-moving equipment. Mr. Sanders again called his attorney that morning. Sanders testified that later during the same day he saw Mr. Morton "and requested that he desist from his bulldozing of the road, which he declined to do, and I told him that he would proceed at his own risk, that we would have no alternative but to bring court action to test the rights."

During the course of this work on and along the 30-foot right of way, Roselawn removed the red pines which the plaintiffs had planted on the western side of the 30-foot strip. The fence on that side, which had been erected jointly by the plaintiffs and Gotts, was removed and replaced by another fence of a similar character westward on the Gott property. The widening of the road and the moving and relocation of the fence were done with the consent and cooperation of the Gotts. The result was that the space between the newly-located fence and the fence

on the east side of the right of way was about fifty feet in width. At the northern end of the right of way near plaintiffs' property line, some of the hemlocks which had been set by Roselawn pursuant to the written agreement were removed so that Roselawn could connect the right of way road at that point with the road system of the eastern part of its cemetery. Theretofore, Roselawn had no means of vehicular access with the right of way road to and from the road system of the eastern part of its cemetery. Mrs. Hartley Sanders, mother of plaintiff William H. Sanders, testified that the hemlocks in this area were removed "and replanted in another place." William H. Sanders testified that removal of the hemlocks at the northern end of the right of way left a gap of approximately sixty-three feet.

George A. Morton testified that the road as improved by the Gotts and Roselawn is a gravel road with a clay and shale base with a "driving surface approximately twenty-two feet wide;" that Roselawn intends to create at that location an asphalt road twenty-one feet wide with a two-foot concrete gutter on each side; and that the purpose in this respect is to give people using the road a sense of being in the same cemetery and to create a feeling of unity between the two sections. Plaintiff William H. Sanders readily admitted in his testimony that the road in its present state is much better than before.

Roselawn has constructed and maintains on the northwestern part of its 20-acre tract a "service area", consisting of buildings used for office purposes and for storage and use of certain machinery and equipment in connection with the operation of its cemetery. The plaintiffs complain of the unsightliness of the service area, of the noise resulting from its use and of a greenish light used by Roselawn in connection with the service area for usual purposes of furnishing artificial light and also as a protection against thievery.

The prayer of the plaintiffs' complaint, generally speaking, is that the defendant be enjoined and restrained from

doing anything which will violate the provisions of the agreement dated October 10, 1958.

The amended answer of the defendants denies various allegations of the complaint; alleges that the written compromise agreement is null and void for lack of consideration; and that the restriction upon purchase by Roselawn of certain of the Gott land is an unlawful restraint upon alienation thereof and contrary to public policy. The amended answer also alleges certain affirmative defenses and includes an amended counterclaim by which the defendants ask for a declaratory judgment in relation to the right of Roselawn to purchase the "brown area", or, in the alternative, in relation to the right of George A. Morton, as an individual, to purchase that portion of the Gott land and to lease it to Roselawn for cemetery purposes. The plaintiffs filed an answer to the amended counterclaim. Though the foregoing constitutes a brief summary of the rather lengthy pleadings, we believe the substance of the issues raised by the pleadings will appear subsequently from our discussion of the written opinion and the judgment of the trial court and of the issues stated and discussed in the briefs and oral argument of counsel for the respective parties.

While the trial court filed an opinion in which he discussed ably and at considerable length the issues and legal principles involved, the judgment order entered is quite brief. By that order, the trial court denied all relief for which the plaintiffs prayed in their complaint, "except that the defendant, Roselawn Memorial Gardens, Inc., a corporation, shall replant the hemlocks in such fashion that they will block plaintiffs' view of the cemetery as much as practicable to be consistent, however, with the right of the defendant, Roselawn Memorial Gardens, Inc., a corporation, to use the roadway, and Roselawn shall bear all expenses of grading, widening, asphalting and maintaining the easement which it uses in common with plaintiffs pursuant to 'Opinion of the Court.'" No objection was made and no cross-assignment of error has been made by Roselawn or any of the other defendants to the portion

of the trial court's judgment embodied in the portion of the judgment order quoted immediately above.

In their respective briefs, counsel apparently agree that the issues presented for decision on this appeal are substantially as follows:

1. Whether the court erred in holding that the written compromise agreement dated October 10, 1958, is void for lack of consideration;

2. Whether the trial court erred in holding that, irrespective of the overall validity or invalidity of the written compromise agreement, (a) the agreement of Roselawn not to purchase the land designated in brown on the exhibit map is invalid and unenforceable as an unwarranted restraint on trade or on alienation, and that, even if that provision were held to be legally enforceable, it would not inhibit the purchase thereof by George A. Morton and his subsequent lease of that parcel of land to Roselawn for use as a part of its cemetery and for cemetery purposes; (b) in holding that Roselawn did not unduly or unlawfully interfere with the plaintiffs' rights in the easement or right of way by widening and otherwise altering the road, by moving and relocating the fence constructed jointly by the Gotts and the plaintiffs on the eastern boundary of the 30-foot strip of land, by removing certain red pine trees placed by the plaintiffs along that fence, by relocating certain hemlocks and making a means of travel at that point from the right of way to the eastern part of Roselawn's cemetery; and (c) that the proposed improvement of the road by means of asphalt and concrete gutters would not unlawfully interfere with the plaintiffs' rights in the easement or right of way as a means of travel to and from their property; and

3. Whether the trial court erred in refusing to enjoin as a nuisance the maintenance and operation by Roselawn of the "service area", which is located 440 feet from the plaintiffs' home.

We are authorized to consider the trial court's written opinion which was made a part of the record in order to

determine the basis of and reasons for that court's judgment. *Sargent* v. *Malcomb,* 150 W. Va. 393, 394, 146 S. E. 2d 561, 563. The trial court was of the opinion that the only possible claim the plaintiffs had as a basis of the compromise agreement was "that of abatement of a nuisance." The court concluded in its written opinion that, inasmuch as the cemetery and the home of the plaintiffs were in a rural, nonresidential area, there was "no foundation in law or fact" for such a claim and that, therefore, the contract, "lacking valuable consideration, was void." We are unable to agree with the conclusion reached by the trial court either from the standpoint of the law or of the facts disclosed by the record in this case.

"The law favors the resolution of controversies and uncertainities through compromise and settlement rather than through litigation. This view is applicable in courts of equity as well as in courts of law. The courts have considered it their duty to encourage rather than to discourage parties in resorting to compromise as a mode of adjusting conflicting claims." 15 Am. Jur. 2d, Compromise and Settlement, Section 4, page 938. The same principles were stated by this Court in *Janney* v. *Virginian Railway Co.,* 119 W. Va. 249, 252, 193 S. E. 187, 188, as follows: "Both law and equity favor repose of litigious matters. Compromise by parties of their differences is favored by all courts. When a matter has thus been put at rest, it should not be disturbed except for grave cause * * *". To the same effect see *Shaeffer* v. *Burton,* 151 W. Va. 761, 770, 155 S. E. 2d 884, 891; *Wright* v. *Davis,* 132 W. Va. 722, 727, 53 S. E. 2d 335, 337; *State ex rel. Showen* v. *O'Brien,* 89 W. Va. 634, 637, 109 S. E. 830, 831; 4 M. J., Compromise and Settlement, Section 4, page 12; 15 Am. Jur. 2d, Compromise and Settlement, Section 4, page 938; 15A C. J. S., Compromise and Settlement, Section 23, page 222.

The trial court and counsel for the defendants have placed reliance on statements made in some decisions of this Court which had their genesis in the fourth point of the syllabus of *Davisson* v. *Ford,* 23 W. Va. 617, as follows: "But if there is no foundation for such claim of liability,

then the promise made to settle this assumed liability has no sufficient consideration to sustain it and no suit can be based on such promise." Our understanding from the language at page 631 is that the Court held that the contract involved in that case was based on a valid consideration. To this extent, therefore, the statement of the Court in the fourth point of the syllabus was in the nature of dictum. The foregoing language from the *Davisson* case was quoted in *Steber* v. *Combs,* 121 W. Va. 509, 514, 5 S. E. 2d 420, 423. The *Steber* case, on the basis of its quotation from the *Davisson* case, became the subject of a critical article in 46 W. Va. L. Q. 342, wherein the following is stated at page 343: "The statement in the main case that the controversy must have some foundation in law and fact is too broad. West Virginia cases variously state the requirements as follows: the claim must be honest and doubtful with some possible foundation in law and fact; it must be colorable, and its voidness must be doubtful. The basic reason for the rule that settlement of a *bona fide* and doubtful claim is consideration, is that there should be an end to litigation. It should be possible to settle a claim without being harassed by future litigation. The rule as stated in the principal case ignores this reason, as by it, no release would ever be effective for it could always be reopened as to the merits of the original controversy. Thus the law of West Virginia is more soundly and probably more accurately stated to be that the settlement of a controversy is consideration even though the well foundedness of it be doubtful, if it has some possible foundation in law and fact."

The fourth point of the syllabus of the *Davisson* case was quoted in *Gordon* v. *Graham,* 137 W. Va. 553, 559-60, 73 S. E. 2d 132, 135-36. In the *Gordon* case, the Court held that the compromise agreement was ineffectual and unenforceable because Gordon did not own sufficient shares of stock to authorize him to maintain a suit, pursuant to the pertinent statute, to wind up the affairs of the corporation; and that not being legally authorized to institute and maintain such a suit, irrespective of other aspects of the controversy, his contract to compromise his alleged right to institute and maintain such a suit was invalid. We do

not consider that an apt precedent for the present case. If a party is by law denied standing in court to maintain a suit, obviously his agreement not to sue is without consideration. That situation is somewhat similar to an effort to compromise or not to sue upon an illegal contract, such as a gambling contract.

Perhaps there is some confusion among decisions of appellate courts, or even in some small degree in statements made in prior opinions of this Court in relation to the essential nature of a valid consideration for a contract to compromise a controversy existing between the contracting parties. We believe, however, that the trial court and counsel for the defendants have placed undue reliance upon isolated statements of law which have been, in some measure, considered out of context, and that the view that the compromise agreement in this case is void for lack of consideration is not supported by a more comprehensive consideration of the decisions of this Court and of appellate courts in general throughout the land.

We deem it important to bear in mind that the present case does not involve an action to abate the maintenance of a cemetery as a nuisance. It involves basically the determination of the rights of the parties under the written compromise agreement.

"Agreements made and acts done under a mistake of law are (if not otherwise objectionable) generally valid and obligatory." *Harner* v. *Price,* 17 W. Va. 523, pt. 1 syl. " 'It is a settled principle of law and sound policy, that a party cannot be permitted to disavow or avoid the operation of an agreement entered into with a full knowledge of the facts, on the ground of ignorance of the legal consequences which flow from these facts.' *Pusey* v. *Gardner,* 21 W. Va. 469, third Pt. Syl." *Robinson* v. *Fairmont Trust Co.,* 109 W. Va. 152 syl., 153 S. E. 909. To the same effect see *Shriver* v. *Garrison,* 30 W. Va. 456, pt. 7 syl., 4 S. E. 660; *Smith* v. *Root,* 66 W. Va. 633, 640, 66 S. E. 1005, 1007; 17 C. J. S., Contracts, Section 145, page 899. It is not asserted in this case that there was a misunderstanding, misrepresentation or concealment of facts which gave rise to the

"differences", which, according to the agreement, the parties desired "to resolve amicably * * * without resort to legal action."

In *Simmons* v. *Yoho*, 92 W. Va. 703, pt. 6 syl., 115 S. E. 851, the Court held: "A decree, though void, may be the basis of a compromise and adjustment of controversies between the parties thereto." That case involved an appeal to this Court from a decree which was void for lack of jurisdiction of the court by which it was entered. By agreement of the parties, the case was "dismissed agreed". The Court held that such agreed dismissal order constituted a final compromise and adjustment of all matters involved or arising on the record, including the element of lack of jurisdiction. See *State ex rel. Queen* v. *Sawyers*, 148 W. Va. 130, 133 S. E. 2d 257.

"A compromise of a controversy is a valuable consideration to sustain a contract." *Rutherford* v. *Rutherford*, 55 W. Va. 56, pt. 2 syl., 47 S. E. 240. See also *Danchatz* v. *Page Coal & Coke Co.*, 110 W. Va. 212, 217, 157 S. E. 404, 406. Whatever the former rule may have been, it now seems clear that if a compromise is based on a claim asserted in good faith, the compromise agreement will not be regarded as void for lack of consideration merely because it ultimately appears that the claim could not have been sustained at law.

> "In many jurisdictions the tendency is to make the test the honesty of the claimant, provided the invalidity of the claim in law or in fact is not entirely obvious. On the other hand, many courts lay down the older rule without qualification, that the claim forborne must be reasonably doubtful in fact or in law. Even in states whose courts lay the principal stress on the honesty and good faith of the claimant, forbearance is insufficient consideration if the claim forborne is so lacking in any foundation as to make its assertion incompatible with both honesty and a reasonable degree of intelligence.

> "While there is a great divergence of opinion respecting the kind of forbearance which will constitute consideration, the weight of authority

holds that although forbearance from suit on a clearly invalid claim is insufficient consideration for a promise, forbearance from suit on a claim of doubtful validity is sufficient consideration for a promise if there is a sincere belief in the validity of the claim." Williston on Contracts (3d Ed.), Volume 1, Section 135B, pages 577-81.

"It has been declared broadly that forbearance to prosecute a doubtful claim is sufficient consideration for a promise, although it is held that the claim must at least be colorable. * * * It is sometimes stated that if an intending litigant bona fide forbears a right to litigate, he gives up something of value. The reality of the claim which is given up must be measured, not by the state of the law as it is ultimately discovered to be, but by the state of the knowledge of the person who at the time has to judge and make the concession. There must, according to this view, be a real cause of action—that is, one that is bona fide and not frivolous or vexatious—but it is not necessary that it be a cause of action which commends itself to the ultimate reasoning of the tribunal which has to consider and determine the case." 17 Am. Jur. 2d, Contracts, Section 117, page 464.

"It is difficult to determine at just what point a claim is transformed from a baseless to a doubtful one, and each case must be measured by its own peculiar facts. It is clear, however, that the claim need not be valid in the sense that claimant be able to recover on it, and it is not material that one party may ultimately be unable to maintain his position, that the other party may have a good defense, that a subsequent judicial decision may show the rights of the parties to have been different from what they at the time supposed, or that one of the parties may afterward find out that he might have obtained a judgment more favorable to him by trying out the claim on its merits. In other words, it is not necessary, to sustain a compromise of a doubtful right, that the parties shall have settled the controversy as the law would have done.

"It is immaterial on which side the right ultimately proves to be, and the compromise may be sustained, although it afterward develops that the claim was ill-founded or unfounded or that the

right is on the other side; nor will the courts inquire as to which party had the better right, since the very object of the compromise is to avoid the risk or trouble of that question. Moreover, to require a party to establish his original right would tend to prevent all compromises and render such contracts useless." 15A C. J. S., Compromise and Settlement, Section 11b, pages 207-08. To the same effect see 4 M. J., Compromise and Settlement, Section 11, page 20; 15 Am. Jur. 2d, Compromise and Settlement, Section 14, page 949.

The legal principles quoted above have been recognized by this Court. The fourth point of the syllabus of *Davis* v. *Lilly,* 96 W. Va. 144, 122 S. E. 444, is as follows: "A compromise of a doubtful question, either of law or fact, where fairly made between parties competent to contract, is binding and cannot be affected by any subsequent investigation or result." The same principle was stated in almost identical language in the third point of the syllabus of *Korne* v. *Korne,* 30 W. Va. 1, 3 S. E. 17. See also *Schuttler* v. *Brandfass,* 41 W. Va. 201, 208-09, 23 S. E. 808, 810-11; *Producers Coal Co.* v. *Mifflin Coal Mining Co.,* 82 W. Va. 311, pt. 4 syl., 95 S. E. 948; *State ex rel. Showen* v. *O'Brien,* 89 W. Va. 634, 109 S. E. 830; *Lawrence* v. *Potter,* 91 W. Va. 361, pts. 3 and 4 syl., 113 S. E. 266. "A note given to a woman in compromise of a bastardy proceeding is binding and valid, and on sufficient consideration, * * *. Nor can the innocence of the putative father be set up as a defense against recovery of such note, in the absence of fraud on the part of the obligee in the procurement thereof." *Billingsley* v. *Clelland,* 41 W. Va. 234, pt. 1 syl., 23 S. E. 812. See also *Burr* v. *Phares,* 81 W. Va. 160, 94 S. E. 30.

William H. Sanders undertook an investigation of the law concerning the rights of a property owner in relation to the construction and maintenance of a public cemetery on land adjacent to his own land or near his home. At the instance of counsel for the defendants, the brief memorandum of authorities resulting from this research was filed as an exhibit and made a part of the record. We believe it is fair to say that this memorandum is inconclusive and that Sanders' research disclosed to him no statute

of this state and no prior decision of this Court directly in point. We believe it is fair to state further that this memorandum tended to disclose the good faith of William H. Sanders and also his opinion that no conclusive or controlling law of this state could be found in relation to the subject.

On May 31, 1957, the plaintiffs' attorney, the late George Richardson, Jr., wrote a second letter to Roselawn's attorney recalling their "several discussions" and stating the writer's information "that the company is acquiring additional land and is planning practically to encompass the Sanders' home by its enlarged graveyard." The concluding paragraph of the letter is, in part, as follows: "* * * Please tell your people that *I have been employed to test out in the courts the rights of these folks* whose homes are threatened by this extensive program for commercializing the burial of the dead. If they want to talk with me about it, I will of course be glad to sit down with them and see what, if anything, can be agreed upon." (Italics supplied.) During the course of the oral argument, it was readily agreed by counsel that Mr. Richardson, in his lifetime, was regarded as an attorney of outstanding integrity and legal ability. The Richardson letter tends to disclose his belief that the plaintiffs had some reasonable or plausible basis for legal proceedings and that the institution of legal proceedings in court was contemplated and was possibly imminent.

George A. Morton was asked the following questions and gave the following answers:

"Q. Why did Roselawn cemetery enter into this contract with Bill Sanders and Katherine Sanders of October 10, '58?

*　*　*　*

"A. I would say this: we were here, interested in the success of our cemetery. Here was, by all outward appearance, a very young and very prominent and a very prosperous attorney going to take us into court. To be—

"Q. Where were you gentlemen from?

"A. We were from Tennessee. To be new in this area starting a new business, to be threatened with

a lawsuit by one of the obviously most prominent young attorneys in the area—

"Q. And where did you draw that conclusion?

"A. A young attorney living in a home like that is bound to be popular and very prominent and very successful.

"Q. At least, that was your opinion?

"A. That was our opinion. (Continuing)—and my thinking, our thinking of our stockholders, it would be just foolish—it would be foolish to go to court with such a man.

* * * *

"Q. You were aware of the fact, I am sure, that basically, Mr. Sanders wanted to keep an area immediately in front of his home as free and clear as possible of a cemetery, isn't that correct?

"A. That's right.

* * * *

"Q. And so, as I understood your testimony on direct examination, you entered into an agreement with Mr. Sanders on terms which you felt that the cemetery, that is, Roselawn, could live with and abide by, isn't that correct?

"A. That's right.

"Q. And weren't you aware, Mr. Morton, that Mr. Sanders throughout these negotiations was contending that he had a legal right to keep the cemetery from engulfing his property? I mean, that's whether he had that right or not, you were aware of the fact that's what he was claiming?

"A. Yes."

We are of the opinion that the trial court was not warranted in its conclusion that an alleged right to abate as a nuisance the creation, maintenance and proposed expansion of the public cemetery was the basis and the sole basis of the compromise agreement. That writing at no place mentions the subject of the abatement of a nuisance. We cannot speculate upon what precise basis or bases Attorney Richardson would have sought to test the rights

of the parties. It is clear that, from Roselawn's standpoint, it was enabled by the agreement to avoid the contemplated litigation; to avoid whatever possibility there may have been of an adverse adjudication; to avoid the certainty of consequent financial expense in counsel fees and otherwise; and to avoid litigation with a prominent citizen of the community which litigation Roselawn obviously felt might adversely affect its new business enterprise in that community. In the circumstances, Roselawn cannot be permitted to have an adjudication that there was no consideration for the compromise agreement by which, after prolonged negotiations and ample time for mature reflection, Roselawn solemnly acknowledged that "differences" had arisen with the plaintiffs which it desired "to resolve amicably * * * without resort to legal action."

We are of the opinion that the owner of a servient estate may grant successive easements for travel over the same road or way to various persons; that the owner of the servient estate may continue thereafter to use his property in any manner and for any purpose reasonably consistent with the enjoyment of the easement by the various persons entitled thereto; and that no person having an easement for travel over such road or way in common with others can be heard to object to any use of or change in the character of such way or road by the other users or by the owner of the servient estate so long as the rights of the one complaining are not thereby interfered with in an undue or unreasonable manner. 28 C. J. S., Easements, Sections 72, 73, 91 and 96; 6 M. J. Easements, Sections 24 and 25, pages 490-493; 25 Am. Jur. 2d, Easements and Licenses, Section 72, page 478. See also *Fleming* v. *Railroad Company,* 51 W. Va. 54, 58, 41 S. E. 168, 170. "Where there are several owners in common in a private way, either may make reasonable repairs which do not injuriously affect his co-owners; but he cannot make an alteration of the course of the way or change its grade or surface, which makes the way less convenient and useful to any appreciable extent to any of the others. * * *." *Stifel* v. *Hannan,* 95 W. Va. 617, 624-25, 123 S. E. 673, 676.

In the light of the authorities previously cited, we are of the opinion that the trial court properly held that the work done cooperatively on the road by Roselawn and the Gotts, including the relocation of the fence, has not interfered unduly or unlawfully with the plaintiffs' easement rights over an area designated in their deed as thirty feet in width; that the plaintiffs' easement rights will not be unduly or unlawfully interfered with if Roselawn creates a widened hard-surface travel area with a concrete gutter on each side thereof; and that the limited use made of that road to date by Roselawn in connection with its cemetery has not been unreasonable or improper. In its opinion, the trial court stated: "* * * Roselawn has also agreed to replant the hemlocks in such fashion that they will still block plaintiffs' view of the cemetery. * * *" As we have stated previously, this agreement on the part of Roselawn was made a part of the judgment order. By way of summary, we are of the opinion that the trial court correctly held that the plaintiffs' easement rights granted to them by the deed for their thirty-acre tract have not been unduly or unlawfully interfered with or violated.

We are further of the opinion that the trial court properly held that the "service area" as located and as used and operated by Roselawn is not a nuisance in legal contemplation and that the plaintiffs were not entitled to have the operation of the service area abated or enjoined as a nuisance. Roselawn's business operations in this respect are not unlawful and are not a nuisance per se. They are in a rural area as distinguished from an urban or residential area. "In general, a fair test as to whether a business lawful in itself, or a particular use of the property, constitutes a nuisance is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case; and ordinarily, where the use made of the property or the conduct of the business is reasonable, no actionable nuisance is created as against which relief may be had. * * *." 66 C. J. S., Nuisances, Section 8c, page 744. "In many cases, the question whether a nuisance has been created depends

114

on the degree of injury done, for not every inconvenience, discomfort, or annoyance is sufficient to constitute a nuisance. But what amount is necessary cannot be defined, and no precise rule can be laid down for determining it. It must be decided according to the circumstances of the particular case, and is largely a question of fact. There must be an appreciable, substantial, tangible injury resulting in actual, material, physical discomfort, and not merely a tendency to injure. It must be real and not fanciful or imaginary, or such as results merely in a trifling annoyance, inconvenience, or discomfort." 39 Am. Jur., Nuisances, Section 30, pages 310-311. See also 14 M. J., Nuisances, Section 6, page 21; and the following prior decisions of this Court in which numerous pertinent authorities were referred to and discussed: *Harless v. Workman,* 145 W. Va. 266, 273-279, 114 S. E. 2d 548, 552-55; *Frye v. McCrory Stores Corp.,* 144 W. Va. 123, 107 S. E. 2d 378; *Martin v. Williams,* 141 W. Va. 595, 93 S. E. 2d 835, 56 A. L. R. 2d 756; *Pope v. Edward M. Rude Carrier Corp.,* 138 W. Va. 218, 75 S. E. 2d 584; *State ex rel. Ammerman v. City of Philippi,* 136 W. Va. 120, 65 S. E. 2d 713.

The judgment of the trial court in relation to the service area and in relation to the alleged interference with the plaintiffs' easement involved mixed questions of law and fact. In numerous cases this Court has held that findings of fact made by a trial chancellor or by a trial court sitting in lieu of a jury will not be reversed unless clearly wrong. *Lieberman v. Lieberman,* 142 W. Va. 716, pt. 5 syl., 98 S. E. 2d 275; *Cyrus v. Tharp,* 147 W. Va. 110, pt. 7 syl., 126 S. E. 2d 31; *Foglesong v. Foglesong Funeral Home, Inc.,* 149 W. Va. 454, pt. 2 syl., 141 S. E. 2d 390; *Boggs v. Settle,* 150 W. Va. 330, 340, 145 S. E. 2d 446, 452; *The State Road Commission of West Virginia v. Oakes,* 150 W. Va. 709, pt. 3 syl., 149 S. E. 2d 392; *Moore v. Hamilton,* 151 W. Va. 784, pt. 1 syl., 155 S. E. 2d 877. The same general legal principle has been applied in relation to a factual determination of the question whether a certain business operation constituted a nuisance. *Martin v. Williams,* 141 W. Va. 595, 93 S. E. 2d 835, 56 A. L. R. 2d 756. We are of the opinion that the trial court's factual findings in these areas are adequately warranted by the proof.

The trial court, in its written opinion, held that the agreement of Roselawn in the written contract "not to purchase that certain tract of land owned by the said Gotts * * * being all of that tract of land designated in brown" on the map is "a restrictive covenant which must be strictly construed against Sanders who, through his attorney, drew the contract, and is certainly in restraint of trade as far as the Gotts are concerned. * * * The Court is impressed with the contention of the defendant that the real motive of Sanders was that of stifling competition on land which he desired to purchase as early as 1953, before the cemetery began its operations in 1955. * * * The Gotts were not parties to the 1958 contract, yet the restrictive covenant in said contract would prevent the Gotts from selling their property to Roselawn at its fair competitive market value. * * *"

In support of this ruling of the trial court referred to immediately above, counsel for the defendants cite 36 Am. Jur., Monopolies, Combinations, and Restraints of Trade, Section 54, page 534, and quote in their brief the first three sentences of that section. That section is a part of Subsection C, beginning at page 529, which is entitled "Restriction of Right to Engage in Business, Trade, or Profession." Section 1, page 478, defines as follows the scope of the entire subject matter of which Section 54 is a part: "The ensuing article discusses (1) exclusive rights which are designated 'monopolies', (2) contracts or combinations which are designed to stifle competition, limit production of commodities, and control prices, (3) conspiracies which are designed to accomplish the same purpose, and (4) contracts which restrain parties thereto in respect of freedom to engage in trade or commerce, or in the practice of a profession." We are of the opinion that the entire subject matter there referred to is inapposite to the question here presented.

The law upon which counsel for defendants rely is illustrated by *Wycoff* v. *Painter,* 145 W. Va. 310, 321, 115 S. E. 2d 80, 87, wherein the Court stated: "Contracts in restraint of trade, if not unreasonable or violative of some public policy or positive law, are valid. *Huddleston* v.

*Mariotti,* 143 W. Va. 419, 102 S. E. 2d 527. The basic test on the question of the validity or enforceability of contracts of this nature is the reasonableness thereof, bearing in mind the rights of the parties and of the public. *Pancake Realty Co.* v. *Harber,* 137 W. Va. 605, 73 S. E. 2d 438. * * *"

Counsel for the plaintiffs in their brief assert, and we believe correctly, that the contract provision here in question is not invalid as an unwarranted restraint on alienation of the tract in question. Although the amended answer alleges that the agreement in this respect is "an unlawful and illegal restriction on the alienation of real estate", counsel for Roselawn have made no such contention in their brief and have referred to no legal authority in support thereof.

Though the rule prohibiting restraints on the alienation of property and the rule against perpetuities are separate and distinct, they are similar in purpose. "* * * While their purposes are similar, in that both are aimed against the withdrawal of property from commerce, they accomplish their ends by different means." 70 C. J. S., Perpetuities, Section 2b, page 576. See *Conley* v. *Gaylock,* 144 W. Va. 457, pt. 1 syl., 108 S. E. 2d 675. "These two rules are so similar in their underlying reason as that they necessarily often shade into each other." *Skeen* v. *Clinchfield Coal Corp.,* 137 Va. 397, 404, 119 S. E. 89, 91. "Because of the similarity of objects, the courts have sometimes adopted the period specified by the rule against perpetuities as a reasonable period for which the power of alienation may be restricted, where such restriction is otherwise valid; * * *." 70 C. J. S., Perpetuities, Section 2b, page 576. The contractual provision here in question places no restraint upon the owners in the alienation or use of their property. In fact, as counsel for Roselawn have pointed out, the owners of the Gott property are not parties to the compromise agreement. The contract merely binds Roselawn not to purchase the property. While the indirect and incidental effect may be to deprive the Gotts of a single prospective purchaser, this result flows from the contract of such prospective purchaser which we consider legal.

As we have previously stated, George A. Morton testified that, in connection with the negotiations leading to the compromise agreement, he was aware of the desire of William H. Sanders not to have the scope of the cemetery extended in the area of the plaintiffs' property. The desire of the plaintiffs in this respect is readily understandable. This was a reasonable basis for the plaintiffs' obtaining an agreement on the part of the cemetery corporation not to buy the portion of the Gott land designated in brown on the exhibit map. The record discloses that George A. Morton, largely, if not wholly, negotiated the compromise agreement from Roselawn's standpoint. It is reasonable to assume that all parties to the compromise agreement recognized that the paramount purpose of this portion of the agreement was to prevent the extension of Roselawn's cemetery operations into that area. We are of the opinion that this portion of the agreement was based on reasonable grounds and fair considerations from the plaintiffs' standpoint and that it is not violative of any principle of law or public policy.

George A. Morton testified that he and his wife have an option from the Gotts to purchase the land in question, if it is adjudged that Roselawn cannot purchase it; and that if they were permitted by law to do so, they would lease the land to Roselawn for cemetery purposes. It does not appear from the record that the Mortons desire to purchase the land unless it can be incorporated in and made a part of Roselawn's cemetery. Inasmuch as George A. Morton and Elizabeth Morton, his wife, are the sole owners of the stock in the Roselawn corporation, a purchase of the land by them as individuals for Roselawn cemetery purposes would be tantamount to and the equivalent of a purchase of the land by Roselawn for cemetery purposes and would be violative of the spirit and purpose of the agreement. We are of the opinion, therefore, that Roselawn is not only precluded by the agreement from buying the portion of the Gott land in question, but also precluded from leasing it or otherwise acquiring the use of it as a part of its cemetery.

"The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for purposes of convenience and to subserve the ends of justice. The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, it will be disregarded by the courts. Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical." 18 Am. Jur. 2d, Corporations, Section 14, page 559. "It is clear that a corporation is in fact a collection of individuals, and that the idea of a corporation as a legal entity or person apart from its members is a mere fiction of the law introduced for convenience in conducting the business in this privileged way. It is now well settled, as a general doctrine, that, when this fiction is urged to an intent not within its reason and purpose, it should be disregarded and the corporation considered as an aggregation of persons, both in equity and at law. * * * In addition to actual fraud, the courts will discard the corporate fiction whenever its retention would produce injustices and inequitable consequences." 18 C. J. S., Corporations, Section 6, pages 376-77. See also Section 7c, page 368; 4 M. J., Corporations, Section 5, page 557, particularly page 559; Fletcher, Corporations (Perm. Ed.), Volume 1, Section 41, pages 166 et seq.; *Caflisch Lumber Co.* v. *Lake Lynn Lumber & Supply Co.,* 119 W. Va. 668, pt. 4 syl., 195 S. E. 854; *Southern Cooperative Foundry Co.* v. *Warlick Furniture Co.,* 117 W. Va. 336, 185 S. E. 773; *Tynes* v. *Shore,* 117 W. Va. 355, pt. 4 syl., 185 S. E. 845.

For reasons stated, the judgment of the Circuit Court of Mercer County is affirmed in part and reversed in part; and the case is remanded to that court with directions to enter a judgment in accordance with the decision of this Court as stated in this opinion.

*Affirmed in part;*
*reversed in part;*
*remanded with directions.*